**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| SUSAN STONE and ERNEST EASTER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TRIZETTO PROVIDER SOLUTIONS, LLC,<br><br>Defendant. | Case No.<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiffs Susan Stone and Ernest Easter (collectively, "Plaintiffs"), individually, and on behalf of all others similarly situated (collectively, "Class members"), by and through their attorneys, bring this Class Action Complaint against Defendant TriZetto Provider Solutions, LLC ("TriZetto"), and complain and allege upon personal knowledge as to themselves and information and belief as to all other matters.

## INTRODUCTION

1. Plaintiffs bring this class action against Defendant for its failure to secure and safeguard Plaintiffs' and others' personally identifying information ("PII") and personal health information ("PHI"), including names, addresses, dates of birth, medical information, prescription information, health insurance information, provider information, treatment and/or diagnosis information, treatment dates, lab or test results, patient account and/or medical record numbers, Medicare/Medicaid information, driver's license or state identification card numbers, other government issued identifications, financial account information, and Social Security numbers.

2. TriZetto is a company that provides complete revenue cycle management services to its clients.

3. Beginning in November 2024, an unauthorized third party gained access to TriZetto's network systems and acquired files containing the PII/PHI of employees, plan members, and patients of TriZetto's clients, including Plaintiffs and Class members (the "Data Breach"). TriZetto did not become aware of the Data Breach until October 2, 2025—approximately eleven months later.

4. Defendant owed a duty to Plaintiffs and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. Defendant breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect Plaintiffs' and Class members' PII/PHI from unauthorized access and disclosure.

5. As a result of Defendant's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiffs' and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiffs bring this action on behalf of themselves and all persons whose PII/PHI was exposed as a result of the Data Breach.

6. Plaintiffs, on behalf of themselves and all other Class members, assert claims for negligence, negligence per se, Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, and unjust enrichment, and seek declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

***Plaintiff Susan Stone***

7. Plaintiff Stone is a citizen and resident of Massachusetts.

8. As a condition of receiving healthcare-related services, Plaintiff Stone provided her PII/PHI to her medical provider, which in turn shared Plaintiff Stone's PII/PHI with TriZetto in connection with receiving services from TriZetto.

9. At all relevant times, TriZetto stored and maintained Plaintiff Stone's PII/PHI on its network systems, including those systems affected in the Data Breach. Plaintiff Stone's PII/PHI was accessed and stolen from TriZetto's network systems in the Data Breach by cybercriminals who intended to misuse that PII/PHI.

10. Plaintiff Stone received a letter from TriZetto dated February 6, 2026, notifying her that her PII/PHI was in the files accessed and acquired by an unauthorized third party in the Data Breach.

11. Plaintiff Stone suffered fraudulent charges totaling approximately $136.78 on her debit card as a result of the Data Breach. As a result, Plaintiff Stone had to spend time and effort attempting to remediate the fraudulent charges and replacing her debit card.

12. Since the Data Breach, Plaintiff Stone has experienced a large increase in the number of spam calls, texts, and emails she receives. Plaintiff Stone has also received messages regarding loan applications she is not responsible for.

13. As a direct result of the Data Breach, Plaintiff Stone has suffered additional injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI; time and effort lost attempting to mitigate the harm caused by the Data Breach; and deprivation of the value of her PII/PHI.

***Plaintiff Ernest Easter***

14. Plaintiff Easter is a citizen and resident of Pennsylvania.

15. As a condition of receiving healthcare-related services, Plaintiff Easter provided his PII/PHI to his medical provider, which in turn shared Plaintiff Easter's PII/PHI with TriZetto in connection with receiving services from TriZetto.

16. At all relevant times, TriZetto stored and maintained Plaintiff Easter's PII/PHI on its network systems, including those systems affected in the Data Breach. Plaintiff Easter's PII/PHI was accessed and stolen from TriZetto's network systems in the Data Breach by cybercriminals who intended to misuse that PII/PHI.

17. Plaintiff Easter received a letter from TriZetto dated February 6, 2026, notifying him that his PII/PHI was in the files accessed and acquired by an unauthorized third party in the Data Breach.

18. Plaintiff Easter has become a victim of identity theft as a result of the Data Breach. After learning that his PII/PHI was stolen by cybercriminals in the Data Breach, Plaintiff Easter checked his credit report and discovered that unfamiliar addresses had been associated with his information, numerous accounts had been fraudulently opened in his name, and multiple hard inquiries had been made without his knowledge or authorization. Plaintiff Easter's credit checks also revealed fraudulently incurred debt that Plaintiff Easter is not responsible for. This fraudulently activity post-dates the Data Breach.

19. As a result of the identity theft he suffered due to the Data Breach, Plaintiff Easter purchased a subscription credit monitoring service at a price of $24.99 per month. Plaintiff Easter intends to continue paying for this credit monitoring service in an effort to mitigate further identity theft and fraud.

20. Since the Data Breach, Plaintiff Easter has experienced a large increase in the number of spam calls, texts, and emails he receives, including messages about accounts being opened in his name that he is not responsible for.

21. Plaintiff Easter has spent approximately 180 hours of time attempting to address and remediate the fraud and identity theft he has already suffered as a result of the Data Breach. Plaintiff Easter continues to spend time and effort trying to mitigate the harm he has already suffered and to prevent further harm from occurring. Plaintiff Easter expects to continue devoting significant time and effort on mitigation efforts into the future.

22. As a direct result of the Data Breach, Plaintiff Easter has suffered additional injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII/PHI; time and effort lost attempting to mitigate the harm caused by the Data Breach; and deprivation of the value of his PII/PHI.

***Defendant TriZetto Provider Solutions, LLC***

23. Defendant TriZetto Provider Solutions, LLC is a Delaware corporation with its principal place of business located at 3300 Rider Trail South, Earth City, MO 63045. It can be served through its registered agent: CSC-Lawyers Incorporating Service Company, 221 Bolivar St., Jefferson City, MO 65101.

## JURISDICTION AND VENUE

24. The Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

25. This Court has general personal jurisdiction over Defendant because it maintains its principal place of business in this State.

26. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of Defendant*

27. TriZetto provides revenue management services to physicians, hospitals, and health systems.[1]

28. In the regular course of its business, TriZetto collects and maintains the PII/PHI of its clients' employees, plan members, and patients, including Plaintiffs and Class members. TriZetto requires clients to provide it with their employees', plan members', and patients' PII/PHI, including the PII/PHI stolen in the Data Breach, in connection with providing services.

29. TriZetto's website contains a Privacy Policy, that states:

> Your personal information will be retained only for so long as reasonably necessary for the purposes set out in this Privacy Notice in accordance with applicable laws, including for the purposes of satisfying any legal, regulatory, accounting or reporting requirements.
>
> [TriZetto] implements appropriate security measures designed to prevent unlawful or unauthorized processing of personal information and accidental loss of or damage to personal information. The data collected via our Sites is stored in a secure server with our ISP who will take periodic backups of such data.[2]

---

[1] *Our Story*, TRIZETTO PROVIDER SOLS., https://www.trizettoprovider.com/who-we-are/our-story (last accessed Feb. 20, 2026).

[2] *Cognizant website Privacy Notice*, COGNIZANT (Dec. 31, 2023), https://www.cognizant.com/us/en/privacy-notice (last visited Feb. 20, 2026). TriZetto is a subsidiary of Cognizant. *See* James Crabtree, *Cognizant rejects claim it overpaid for TriZetto*, N.Y. INST. FIN. (Sept. 15, 2024), https://www.nyif.com/articles/cognizant-rejects-claim-it-overpaid-for-trizetto.

30. Plaintiffs and Class members entrusted TriZetto's clients with their PII/PHI in exchange for receiving services, and those TriZetto clients in turn provided Plaintiffs' and Class members' PII/PHI to TriZetto.

***The Data Breach***

31. In November 2024, an unauthorized third party gained access to TriZetto's network systems and accessed and acquired files containing the PII/PHI of TriZetto's clients' employees, plan members, and patients, including "name, address, date of birth, Social Security number, health insurance member number (which, for some individuals, may be a Medicare beneficiary identifier), health insurer name, primary insured or dependent information, and other demographic, health, and health insurance information."[3]

32. Despite the fact that the Data Breach occurred in November 2024, TriZetto did not become aware of it until approximately October 2, 2025, approximately 11 months later.[4]

33. While TriZetto learned of the data breach on or about October 2, 2025, it waited until approximately December 9, 2025—over nine weeks later—to begin notifying Plaintiffs and Class members that the Data Breach occurred and that their PII/PHI was accessed and acquired by unauthorized persons.

34. TriZetto acknowledges that the Data Breach places Plaintiffs and Class members in imminent danger of fraud and identity theft. TriZetto "encourages individuals to remain vigilant against incidents of identity theft and fraud, review account statements, and monitor their free credit reports for suspicious activity and to detect errors."[5]

[3] Notice of Data Breach, KROLL, https://tpsincident.kroll.com (last visited Feb. 20, 2026).
[4] *Id.*
[5] *Id.*

35. Defendant's failure to promptly notify Plaintiffs and Class members that their PII/PHI was disclosed, accessed, and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII/PHI before Plaintiffs and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiffs and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

***Defendant Knew that Criminals Target PII/PHI***

36. At all relevant times, Defendant knew, or should have known, that the PII/PHI that they collected, shared, and stored was a target for malicious actors. Despite such knowledge, Defendant failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiffs' and Class members' PII/PHI from unauthorized disclosures and cyberattacks that it should have anticipated and guarded against.

37. It is well known among companies that store sensitive personally identifying information that such information—such as the PII/PHI stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[6]

38. Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2025 report, Kroll found that "the healthcare industry was the most breached" in

[6] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

2024.[7] The company found that 23% of the breaches that it handled responses for were from the healthcare industry, up from 18% in 2023.[8]

39. PII/PHI is a valuable property right.[9] The value of PII/PHI as a commodity is measurable.[10] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[11] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[12] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

40. Criminals piece together bits and pieces of compromised PII/PHI for profit by creating "Fullz" packages. "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more.

41. With "Fullz" packages, cyber-criminals can cross-reference two sources of PII/PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly

---

[7] Denyl Green, *Data Breach Outlook*, KROLL (Feb. 18, 2025), https://www.kroll.com/en/insights/publications/cyber/data-breach-outlook-2025.

[8] *See id*.

[9] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[10] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[11] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[12] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

42. The development of "Fullz" packages means here that the stolen PII/PHI from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII/PHI that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

43. Thus, even if certain information (such as contact information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to criminals.

44. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[13] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[14]

45. All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security Numbers, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[15] According to a report released by the Federal Bureau of

---

[13] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[14] *Id.*

[15] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[16]

46. Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[17] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[18]

47. Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[19]

48. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

[16] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[17] Steager, *supra* note 13.

[18] *Id.*

[19] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

### *Theft of PII/PHI Has Grave and Lasting Consequences for Victims*

49. Theft of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[20] [21]

50. Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[22]

51. Identity theft is not an easy problem to solve. In a 2025 survey, the Identity Theft Resource Center found that 20% of victims of identity misuse needed more than 30 days to resolve issues stemming from identity theft and 13% required three months or more.[23]

52. Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records

---

[20] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Feb. 20, 2026).

[21] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[22] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[23] Identity Theft Resource Center, *2025 Consumer Impact Report*, IDENTITY THEFT RES. CTR. (2025), https://www.idtheftcenter.org/publication/itrc-2025-consumer-impact-report/ (last accessed Feb. 20, 2026).

that can plague victims' medical and financial lives for years."[24] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[25] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[26] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[27]

53. A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

> a. Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.
>
> b. Significant bills for medical goods and services neither sought nor received.
>
> c. Issues with insurance, co-pays, and insurance caps.
>
> d. Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.
>
> e. Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

---

[24] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIV. F. (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.
[25] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . .*, *supra* note 16.
[26] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Feb. 20, 2026).
[27] *Id.*

f. As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

g. Phantom medical debt collection based on medical billing or other identity information.

h. Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[28]

54. There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[29]

55. It is within this context that Plaintiffs and all other Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market.

***Damages Sustained by Plaintiffs and Class Members***

56. Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the disclosure, compromise, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendant's possession; and

---

[28] *See* Dixon & Emerson, *supra* note 24.

[29] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

(vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach.

## CLASS ALLEGATIONS

57. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

58. Plaintiffs bring this action on behalf of themselves and all members of the following Class of similarly situated persons:

> All persons whose personally identifiable information or personal health information was accessed in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach.

59. Plaintiff Stone also brings this action on behalf of herself and all members of the following subclass of similarly situated persons (the "Massachusetts Subclass"):

> All residents of Massachusetts whose personally identifiable information or personal health information was accessed in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach.

60. Plaintiff Easter also brings this action on behalf of himself and all members of the following subclass of similarly situated persons (the "Pennsylvania Subclass"):

> All residents of Pennsylvania whose personally identifiable information or personal health information was accessed in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach.

61. Excluded from the Class are TriZetto Provider Solutions, LLC and its affiliates, parents, subsidiaries, officers, agents, and directors; as well as the judge(s) presiding over this matter and the clerks of said judge.

62. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

63. The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. Reports indicate that the Data Breach affected approximately 700,000 individuals.[30]

64. Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a. Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class members' PII/PHI from unauthorized access and disclosure;

b. Whether Defendant had a duty not to disclose the PII/PHI of Plaintiffs and Class members to unauthorized third parties;

c. Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiffs' and Class members' PII/PHI;

d. Whether Defendant breached those duties to protect Plaintiffs' and Class members' PII/PHI; and

e. Whether Plaintiffs and Class members are entitled to damages and the measure of such damages and relief.

65. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

66. Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all proposed members of the Class, had their PII/PHI compromised in the Data Breach. Plaintiffs and Class members were injured by the same wrongful acts, practices, and omissions committed by

---

[30] *E.g.*, *Contractor Data Breach*, LA PINE HEALTH (Jan. 29, 2026), https://www.lapinehealth.org/zh-hk/news-and-stories/contractor-data-breach.

Defendant, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

67. Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs are an adequate representative of the Class in that they have no interests adverse to, or that conflict with, the Class they seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

68. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress from Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

69. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

70. Defendant owed a duty to Plaintiffs and all other Class members to exercise reasonable care in safeguarding and protecting their PII/PHI in its possession, custody, or control.

71. Defendant knew, or should have known, the risks of collecting, sharing, and storing Plaintiffs' and Class members' PII/PHI, and the importance of maintaining secure systems. Defendant knew, or should have known, of the many data breaches that targeted organizations storing PII/PHI in recent years.

72. Given the nature of Defendant's businesses, the sensitivity and value of the PII/PHI it collects, shares, and maintains, and the resources at its disposal, Defendant should have identified the vulnerabilities in its systems and prevented the Data Breach from occurring.

73. Defendant breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it—including Plaintiffs' and Class members' PII/PHI.

74. It was, or should have been, reasonably foreseeable to Defendant that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and Class members' PII/PHI to unauthorized individuals.

75. Additionally, Defendant had an obligation to provide prompt and accurate notice of the Data Breach to Plaintiffs and Class members. Defendant knew that the PII/PHI accessed by cybercriminals in the Data Breach was highly sensitive and can be used to commit identity theft and fraud using Plaintiffs' and Class members' PII/PHI, which would cause substantial harm to Plaintiffs and Class members.

76. But for Defendant's negligent conduct or breach of the above-described duties owed to Plaintiffs and Class members, their PII/PHI would not have been compromised.

77. As a result of Defendant's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and all other Class members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantial increase in the likelihood of, or imminent threat of, identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendant's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach.

## COUNT II
## NEGLIGENCE PER SE

78. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

79. Defendant's duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of

Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

80. Defendant's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to employ reasonable measures to protect and secure PII/PHI.

81. Defendant violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiffs' and all other Class members' PII/PHI, not providing notice to Plaintiffs and Class members within 60 days of the Data Breach, and not complying with applicable industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII/PHI they obtain and store, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damage that would result to Plaintiffs and the other Class members.

82. Defendant's violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitute negligence per se.

83. Plaintiffs and Class members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

84. The harm occurring as a result of the Data Breach is the type of harm HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses such as Defendant, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiffs and Class members as a result of the Data Breach.

85. It was reasonably foreseeable to Defendant that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiffs' and Class members' PII/PHI to unauthorized individuals.

86. 68. The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of Defendant's violations of the HIPAA Privacy and Security Rules and Section 5 of the FTCA. As a result of Defendant's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and all other Class members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantial increase in the likelihood of, or imminent threat of, identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendant's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach.

## COUNT III
## VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW ("UTPCPL")
## 73 P.S. §§ 201-1–201-9.3
***On Behalf of Plaintiff Easter and the Pennsylvania Subclass Only***

87. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

88. Plaintiff Easter brings this claim individually and on behalf of the Pennsylvania Subclass only.[31]

89. Defendant performs services in the Commonwealth of Pennsylvania.

90. Plaintiff, Class members, and Defendant are "persons" as defined by the UTPCPL. 73 P.S. § 201-2(2).

91. Defendant's services are "trade" and "commerce" under the statute. 73 P.S. § 201-2(3).

92. Defendant obtained Plaintiff's and Class members' PII/PHI in connection with the healthcare-related and other services that Defendant performed.

93. Defendant engaged in unfair or deceptive acts in violation of the UTPCPL by failing to implement and maintain reasonable security measures to protect and secure the PII/PHI of its client's patients in a manner that complied with applicable laws, regulations, and industry standards.

94. The UTPCPL lists twenty-one instances of "unfair methods of competition" and "unfair or deceptive acts or practices." 73 P.S. § 201-2(4). Defendant's failure to adequately protect Plaintiff and Class members' PII/PHI while holding out that it would adequately protect the PII/PHI falls under at least the following categories:

a. Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a

[31] For purposes of this claim only, "Plaintiff" refers to Plaintiff Easter and "Class" refers to the Pennsylvania Subclass.

sponsorship, approval, status, affiliation or connection that he does not have (73 P.S. § 201-2(4)(v));

b. Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another (73 P.S. § 201-2(4)(vii));

c. Advertising goods or services with intent not to sell them as advertised (73 P.S. § 201-2(4)(ix)); and

d. Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding (73 P.S. § 201-2(4)(xxi)).

95. Due to the Data Breach, Plaintiff and Class members have lost property in the form of their PII/PHI. Further, Defendant's failure to adopt reasonable practices in protecting and safeguarding its clients' patients' PII/PHI will force Plaintiff and Class members to spend time or money to protect against identity theft. Plaintiff and Class members are now at a higher risk of identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for Defendant's practice of collecting and storing PII/PHI without appropriate and reasonable safeguards to protect such information.

96. As a result of Defendant's violations of the UTPCPL, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of, or imminent threat of, identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendant's possession; (vi) future costs in terms of time, effort, and

money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT IV
## UNJUST ENRICHMENT

97. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

98. Plaintiffs and Class members conferred a monetary benefit upon Defendant through the provision of their PII/PHI, which Defendant utilized to provide services. Plaintiffs did so with an implicit understanding that Defendant would protect the PII/PHI it collects, stores, and shares.

99. Defendant accepted or had knowledge of the benefits conferred upon it by Plaintiffs and Class members. Defendant benefitted from the receipt of Plaintiffs' and Class members' PII/PHI, as this was used to facilitate their business operations.

100. As a result of Defendant's conduct, Plaintiffs and Class members suffered actual damages in an amount equal to the difference in value between the insurance services made with reasonable data privacy and security practices and procedures that they bargained for, and those insurance services without reasonable data privacy and security practices and procedures that they received.

101. Defendant should not be permitted to retain the money belonging to Plaintiffs and Class members because Defendant failed to adequately implement the data privacy and security procedures for themselves that Plaintiffs and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

102. Plaintiffs and Class members have no adequate remedy at law.

103. Defendant should be compelled to provide for the benefit of Plaintiffs and Class members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

**PRAYER FOR RELIEF**

Plaintiffs, individually and on behalf of all other members of the Class, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

A. Certifying the Class as requested herein, designating Plaintiffs as Class Representative, and appointing Plaintiffs' counsel as Class Counsel;

B. Awarding Plaintiffs and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiffs and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, on behalf of themselves and the Class, seek appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D. Awarding Plaintiffs and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding Plaintiffs and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiffs and the Class such other favorable relief as allowable under law.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

Dated: March 3, 2026

Respectfully submitted,

/s/ John S. Steward
John S. Steward #45932MO
**STEWARD LAW FIRM, LLC**
14824 Clayton Road, Suite 24
Chesterfield, MO 63017
Tel: 314-504-0979
js@molawgroup.com

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Tel: 312.621.2000
Fax: 312.641.5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Counsel for Plaintiff*

**Pro hac vice* forthcoming